REVISED OPINION - July 7, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-30385
_____


SAMMIE BARMAN DELAUNE, Estate; DENISE
LOVELESS, Co-Executors and Transferees
of the Estate of Sammie Barman
Delaune; MAE ACY AMEDEE, Co-Executors
and Transferees of Estate of
Sammie Barman Delaune; WILLIAM R.
SMITH, JR., Transferees of the Estate
of Sammie Barman Delaune;
PHYLLIS ROBIRA ZAPP, Transferees of
the Estate of Sammie Barman Delaune;
BERTHA THOMAS, Transferees of the
Estate of Sammie Barman Delaune;
JANE LEE VAN REENEN, Transferees of
the Estate of Sammie Barman Delaune;
JOYCE B. METCALF, Transferees of the
Estate of Sammie Barman Delaune;
PEGGY ANN GEILER, Transferees of the
Estate of Sammie Barman Delaune;
SAMUEL BUCKMASTER, JR., Transferees
of the Estate of Sammie Barman Delaune,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

Defendant-Appellee.

_____

Appeal from the United States District Court for the
Middle District of Louisiana
_____

June 29, 1998

Before WISDOM, JOLLY, and HIGGINBOTHAM, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This case will demonstrate how, under the Louisiana Law Civil, the past is not dead; how the past will not die; and how, indeed, the past is not even past. But first, let us say that this appeal arises from the district court's denial of an estate tax refund to the appellants, the estate and certain heirs of Sammie Barman Delaune. The dispute primarily involves the purported renunciation of a Louisiana succession, which both the Commissioner of Internal Revenue and the district court found to be inadequate as a matter of federal and Louisiana law. In particular, the district court held the renunciation to be invalid under Louisiana law because the Louisiana Civil Code plainly does not provide for the renunciation of a succession by the heirs of a dead heir on her behalf. In this case, however, the Law Civil will not let us stop with a plain reading of the current Code. Because, under the Law Civil, the Code Napoleon of 1804 adds clarity to the work of Louisiana's subsequent Digesters and Redactors, and hence to the Code we read today, we hold that Louisiana law does in fact provide for the renunciation of a succession by the heirs of an heir, and therefore find no state law defect in the renunciation at issue. Because we further hold that the renunciation was not otherwise defective as a matter of federal law, we reverse the judgment of the district court.

The relevant facts are undisputed. Joseph "Jack" Delaune died on May 31, 1986. Under his will, his entire estate, with the exception of $3,000 in special bequests, was devised to his wife, Sammie.

For some time prior to Jack's death, Jack and Sammie had been living in a nursing home. Jack's brother, William Delaune, had been handling Jack's affairs under a power of attorney, and he paid for Jack and Sammie's expenses by writing checks out of an account that belonged to the couple as undivided community property. After Jack died, William Delaune continued to pay Sammie's expenses out of this account, and replenished it on one occasion with $100,000 drawn from another community property account. During this time, the income from Jack's estate continued to accumulate as it had done before, which is to say that it went into the community property accounts. It is undisputed that the expenses incurred by Sammie after Jack's death were less than the income from her portion of the community property.

Sammie's will was a mirror image of Jack's, and devised her entire estate to him, with the exception of $3,000 in special bequests. Because Jack had predeceased Sammie, this devise to him had lapsed, and, unless something were done, their combined estates, with the exception of $6,000, would pass to Sammie's heirs

by intestacy when she died. As Jack had a separate line of heirs from Sammie, this was not a good outcome, both as a matter of Jack and Sammie's expressed desires for their heirs, and from the perspective of a long and contentious probate fight.

On January 14, 1987, Sammie met with attorneys to discuss her estate planning options. Among other things, Sammie's attorneys proposed redrafting her will to provide a bequest to Jack's heirs or executing a renunciation of some portion of the bequest she had received from Jack, so that it would pass immediately to Jack's heirs by intestacy. Sammie's attorneys pointed out that the latter option would be much better from a tax perspective, as it would allow the property to go to Jack's heirs with only one level of estate tax (Jack *-Tax->* Jack's heirs) as opposed to two (Jack *-Tax-> Sammie -Tax->* Jack's heirs).

Based on the tax advantages, Sammie decided to go with the renunciation plan, and directed her attorneys to return when they had drawn up the appropriate papers. The Fell Sergeant[1] who commands our last days waits not for the orderlies, however, and before the renunciation could be completed and executed, Sammie lapsed into a coma. She died on January 26.

---

[1]William Shakespeare, <u>Hamlet</u>, act 5 sc. 2.

Despite the medical evidence to the contrary, William Delaune remained convinced that Sammie could be reanimated for a limited amount of post-hoc estate planning. On February 6, acting in his capacity as an heir of Jack, he filed a petition in Louisiana state court for a Rule to Show Cause why the aborted renunciation should not be given effect. He contended, essentially, that Sammie's decision to make a renunciation before she died created a legally enforceable "natural" obligation in favor of Jack's heirs that the court was bound to recognize.

On February 23, a meeting was held with a number of the attorneys representing various of the interested parties and heirs. They discussed, among other things, the legality of a renunciation made on Sammie's behalf, and agreed on a plan for achieving a more "equitable" distribution of the combined successions to the two lines of heirs.

On February 27, a hearing was held on the Rule to Show Cause. At that hearing, an agreed judgment was signed by all interested parties (other than Sammie's estate) and approved by the probate judge. Under the judgment, Sammie's heirs purported to renounce, in her name and on her behalf, a portion of Jack's succession equal to two-sevenths of the combined estates.

Sammie's estate filed an estate tax return in which the "renounced" portion of Jack's succession was excluded from her

5

gross estate, on the basis that there had been a qualified disclaimer pursuant to I.R.C. § 2518. After an audit, the Commissioner took issue with this exclusion, and declared a deficiency of $146,728 to cover the estate tax that he felt should have been paid on the purportedly renounced portion of Jack's succession. As the assets in Sammie's estate had been already largely distributed, the Commissioner sent notices of transferee liability to Sammie's heirs, and, on November 28, 1990, the estate and heirs paid the deficiency in full.

## II

After exhausting their administrative remedies, on April 26, 1994, Sammie's estate and nine of her fourteen heirs (the "Delaunes") filed suit in the Federal District Court for the Middle District of Louisiana seeking a refund of the entire deficiency. Eventually, this claim went to trial before District Judge Parker. At trial, the Delaunes argued that the renunciation had been a qualified disclaimer under I.R.C. § 2518, such that the renounced portion of Jack's succession was properly excluded from Sammie's gross estate. In the alternative, they asserted that the natural obligation to renounce arising from Sammie's pre-death decision constituted a claim against her estate for the amount of the renunciation, and that this amount was therefore also excludable pursuant to I.R.C. § 2053(a)(3).

6

The Commissioner argued that the renunciation was not a qualified disclaimer under § 2518 because Louisiana law does not allow for renunciation by the heirs of an heir, and because Sammie had accepted the benefits of Jack's succession for purposes of § 2518(b)(3) before the renunciation was made. The Commissioner also contended that the natural obligation was not a claim against the estate under § 2053 because it was not enforceable as a matter of Louisiana law and because it was not contracted for in exchange for an adequate consideration in money or money's worth, as required by § 2053(c)(1). Finally, the Commissioner also argued that, even if a refund were due, the nine heirs and estate could only claim the amounts that they had actually paid, not the entire deficiency.

On March 7, 1997, Judge Parker issued his findings of fact and conclusions of law. He ruled that § 2518(b)(4) implicitly requires that a disclaimer be valid under state law before it can be a qualified disclaimer for federal estate tax purposes, as that section provides that the interest at issue must pass without any direction from the disclaimant. Further, Judge Parker held that the renunciation at issue was not valid under Louisiana law. He based this conclusion principally on La. Civ. Code art. 1007, which expressly allows the heirs of an heir to *accept* a succession on behalf of the dead heir. Because this provision contains no

7

mention of renunciation, Judge Parker reasoned that renunciation by the heirs of an heir was prohibited by implication. He therefore concluded that the attempted renunciation in this case was not a qualified disclaimer for federal estate tax purposes. In the alternative, Judge Parker ruled that the attempted renunciation was also not a qualified disclaimer because Sammie had previously accepted the benefits of Jack's succession in the form of the nursing home expense payments and interest accrual. Finally, Judge Parker also held that Sammie's alleged decision to renounce did not create an enforceable natural obligation as a matter of Louisiana law, and was therefore not an excludable claim against her estate for purposes of § 2053. On the basis of these holdings, Judge Parker sustained the Commissioner's declaration of deficiencies and denied the Delaunes' request for a refund. From this final judgment the Delaunes timely appeal.

III

We review the decision of a district court in a tax matter applying the same standards used in reviewing a decision of the Tax Court. Estate of McLendon v. Commissioner of Internal Revenue, 135 F.3d 1017, 1021 (5th Cir. 1998). Findings of fact are accepted unless clearly erroneous; legal conclusions are reconsidered de novo. Ballard v. United States, 17 F.3d 116, 118 (5th Cir. 1994).

IV

As in the district court, on appeal the Delaunes urge two alternative theories to justify the exclusion of the "renounced" portion of Jack's succession from Sammie's estate. First, they argue that the renunciation was a qualified disclaimer excludable under § 2518. Second, they assert that Sammie's decision to make the renunciation gave rise to a natural obligation under Louisiana law that is excludable under § 2053. Based on the clear terms of the federal statute and regulations, and the history of the relevant Louisiana code provision, we hold that the renunciation in question was a qualified disclaimer for purposes of § 2518. Because this is sufficient to justify the Delaunes' exclusion, we need not reach the merits of their alternative argument.

In general, § 2518 allows an heir to exclude from her own gross estate any interest in an inheritance that she disclaims with a "qualified" disclaimer.  There are various requirements for a disclaimer to be qualified.  Among other things, the disclaimer must be made before the heir has "accepted the interest or any of its benefits."  § 2581(b)(3).  In addition, it must also be the case that "as a result of the refusal, the interest passes without any direction on the part of the person making the disclaimer." § 2518(b)(4).  See also Estate of Monroe v. Commissioner of Internal Revenue, 124 F.3d 699, 703 & n.1 (5th Cir. 1997).

The Commissioner argues that the renunciation in this case was not a qualified disclaimer because it was not valid to pass an interest under Louisiana law, as implicitly required by § 2518(b)(4), and because it was not made before Sammie had accepted the benefits of the succession, as explicitly required by § 2518(b)(3).  There is no merit to either argument.

The Commissioner first contends that the February 27 renunciation was not qualified for purposes of § 2518 because it was not valid to pass an interest under Louisiana law.  As we

understand his argument,[2] the Commissioner reaches this conclusion based solely on his perception that Louisiana law does not allow the heirs of a dead heir to renounce on her behalf, as was attempted in this case.  We disagree with this construction of the relevant Louisiana code provision, and therefore hold that the renunciation in question was a valid one.

(1)

As an initial matter, we do agree with the Commissioner that state law validity is a necessary prerequisite for a disclaimer to be qualified under § 2518 in the circumstances of this case.  As the district court also concluded, the clear terms of § 2518(b)(4) necessarily require that the disclaimer itself be valid to pass an interest under state law, because only in such a situation can it

---

[2]The Commissioner has not urged that the February 27 renunciation was defective as a matter of Louisiana law on any other basis--as, for example, a form fault--and we generally do not consider arguments that have not been raised by the parties on appeal.  United States ex rel. Thompson v. Columbia/HCA Healthcare Corp., 125 F.3d 899, 903 n.3 (5th Cir. 1998).  That said, although the form of the February 27 transaction was admittedly not in strict compliance with the procedural requirements of the Louisiana Civil Code, see La. Civ. Code art. 1017 (requiring that renunciation be made by public act before a notary, in presence of two witnesses), it nonetheless appears to fall within the doctrine of judicial renunciation that has long been recognized by the Louisiana Supreme Court.  See Succession of Tertrou, 47 So.2d 681, 685 (La. 1950) (succession may be renounced by judicial declaration in addition to the procedures listed in article 1017) (citing Union National Bank v. Choppin, 46 La. Ann. 629 (1894), and Carter v. Fowler, 33 La. Ann. 100 (1881)).

11

be said that the interest passes "as a result of the refusal" and "without any direction on the part of the person making the disclaimer." Thus, for example, a naked invalid disclaimer would be insufficient, as it would not pass an interest. Similarly, an invalid disclaimer coupled with a valid donative transfer would also be insufficient, as the interest would not pass "without any direction on the part of the person making the disclaimer."[3] We

---

[3]Of course, the latter case would nonetheless constitute a qualified disclaimer under § 2518(c)(3), as that section exempts the disclaimer itself from the rigors of § 2518(b)(1) & (4) where it is accompanied or replaced by an effective written transfer of the interest to the party or parties who would have received it had a qualified disclaimer been made. The clear language and legislative history of § 2518(c)(3) strongly suggest that it was enacted specifically to address the issue in this case, i.e., the fate of an otherwise unobjectionable disclaimer that is potentially invalid under state law. See, e.g., S. Rep. No. 97-144, at 142 (1981), reprinted in 1981 U.S.C.C.A.N. 241-42 (provision designed to overcome § 2518(b)(4)'s implicit requirement that disclaimer be valid to pass interest under state law). Read this way, § 2518(c)(3) is also well in keeping with the overall point of § 2518, which was, as both parties to this case agree, to bring a certain degree of federal uniformity to an area of taxation that had previously been entirely subject to the whims of state law. See H.R. Rep. No. 94-1380, at 65-68 (1976), reprinted in 1976 U.S.C.C.A.N. 3419-22.

Despite its obvious potential relevance, § 2518(c)(3) is not implicated in this case because the Delaunes' attorneys failed to attempt any transfer of the interest in question apart from the disclaimer itself. Had they bothered to argue the issue on appeal (which, perhaps unsurprisingly, they also did not, see note 2, supra), we would have been forced to agree with the only other federal court to consider the issue that § 2518(c)(3) requires, at a minimum, some attempt at a valid written transfer to named individuals. See Estate of Dancy v. Commissioner of Internal Revenue, 89 T.C. 550, 562 (1987), rev'd on other grounds, 872 F.2d 84 (4th Cir. 1989).

12

note in passing that this construction of § 2518(b)(4) accords with that reached by all of the other federal courts to have considered the issue.[4]

As a further predicate, we also agree with the Commissioner that we are not bound on the state law validity question in this case by the mere judgment entered by the Louisiana probate court. In <u>Commissioner of Internal Revenue v. Estate of Bosch</u>, 387 U.S. 456, 462-65 (1967), the Supreme Court laid down an essentially <u>Erie</u>-based approach to the analysis of state court adjudications of state law questions that have occurred in prior aspects of a federal tax case. <u>Brown v. United States</u>, 890 F.2d 1329, 1341-42 (5th Cir. 1989); <u>cf.</u> <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 54 (1938). Under this circuit's longstanding interpretation of the rather ambivalent majority opinion in <u>Bosch</u>, "unless the highest court in the state has spoken to the issue, a federal court is to make its own inquiry into state law." <u>Brown</u>, 890 F.2d at 1342. In conducting this inquiry, of course, the lower state court's ruling will have some relevance. <u>Id.</u> That relevance will be limited,

---

[4]<u>See</u> <u>DePaoli v. Commissioner of Internal Revenue</u>, 62 F.3d 1259, 1261-62 (10th Cir. 1995); <u>Estate of Goree v. Commissioner of Internal Revenue</u>, 1994 WL 379246 (T.C.); <u>Estate of Bennett v. Commissioner of Internal Revenue</u>, 100 T.C. 42, 66 (1993); <u>Dancy</u>, 89 T.C. at 554. The only arguably contrary decision reached by any court would appear to be <u>In re Witz</u>, 406 N.Y.S.2d 671, 673 (N.Y. Sup. Ct. 1978).

13

however, and "'will vary, depending on the particular tax statute involved as well as the nature of the state proceeding that produced the judgment.'" Estate of Warren v. Commissioner of Internal Revenue, 981 F.2d 776, 781 (5th Cir. 1993) (Garwood, J.) (quoting Brown, 890 F.2d at 1342). Where, as here, the state court adjudication arises out of a manifestly non-adversarial proceeding and the relevant federal tax statute indicates no preference for the sanctity of the state court's ruling, we need accord no particular deference, and must conduct our own investigation of the relevant state law as declared by the state's highest court. See Brown, 890 F.2d at 1342.

(2)

Turning to that question, we begin our inquiry with La. Civ. Code art. 1007. Under that article, it is clear that "[n]ot only the person who is entitled to an inheritance may accept it, but if he dies before having expressly or tacitly accepted or rejected it, his heir shall have a right to accept it under him." As the district court correctly surmised, the core question posed by this case is whether article 1007 also allows the heirs of a dead[5] heir

---

[5]*Nemo est hæres viventis*; no one is heir to the living. Co. Litt. 8 (that is, Sir Edward Coke, Commentary upon Littleton 8 (Charles Butler ed., Legal Classics Library 18th ed. 1985) (1628)).

14

to renounce on her behalf, as was attempted here.  Based on the history and logic of the statute, we conclude that it does.

At the outset, we note that this question has not been squarely addressed by the Louisiana Supreme Court.  As such, we must rely primarily on the history and lineage of article 1007, its construction by commentators, and its place in the statutory framework.  See Shelp v. National Sur. Corp., 333 F.2d 431, 435 n.13 (5th Cir. 1964) (Wisdom, J.).[6]

---

[6]As Judge Wisdom noted, the civil law interpretive process is in some respects fundamentally different from the common law process with which we are generally familiar.  This is particularly so where the interpretation is of a civil code:

> "The problem may be controlled by a code article. Controversy then will center about the interpretation of this article.  For this there is an elaborate apparatus, the classic account of which is given by Geny, and by Savigny in the entire first volume of his System.  The logical interdependence of the various texts, ethical notions, systematic considerations, contextual influences, historical factors, consequential effects, and the like, receive consideration. The important thing is the elaborate effort to ascertain the genuine significance of the text.  In this there is no mere reliance upon the holdings of prior decisions. Indeed, the code civil expressly forbids decisions to be made so as to form a general rule of law, and anyone who examines Dalloz and Sirey will not find reference to authoritative materials other than the code texts.  There is no stare decisis of interpretation.  Furthermore, the interpretative process is not confined to the judges alone.  The chief reliance is rather upon the theoretician as he has indicated his opinions in doctrinal writing.  Interpretation of statutory texts is not the esoteric job of judges.  It is an intellectual process in which law teachers have played a greater part

15

Beginning with its history, we can readily see that article 1007 of the current Louisiana Civil Code (of 1870) is an exact copy of the English text of article 1001 of the Code of 1825.[7]  The French text of article 1001,[8] in turn, is an almost exact copy of article 84[9] of the first title of the third book of the Digest of 1808.[10]  Like much of the Digest of 1808, article 84 was taken directly from the French Code Napoleon of 1804.  Under article 781 of the Code Napoleon, "[w]hen he to whom a succession has fallen has died without having repudiated it or without having accepted it expressly or tacitly, his heirs may accept it *or repudiate it* under

---

than judges."

Shelp, 333 F.2d at 435 n.13 (quoting Franklin, The Historic Function of the American Law Institute: Restatement as Transitional to Codification, 47 Harv. L. Rev. 1367, 1377 (1934)).

[7]The Code of 1825 was published in both a French and an English version, but it was originally drafted in French alone. See Shelp, 333 F.2d at 436-37.

[8]"*Non seulement celui qui est appelé à une succession, peut l'accepter, mais s'il est mort, avant que de l'avoir acceptée expressément ou tacitement, ou l'avoir répudiée, ses héritiers peuvent l'accepter de son chef.*"

[9]"*Non-seulement celui qui est appelé à une succession, peut l'accepter, mais s'il est mort avant que de s'être décidé sur le parti de l'acceptation ou de la répudiation, les héritiers de cet héritier peuvent, de leur chef, l'accepter.*"

[10]Which was originally drafted in French as well. See Shelp, 333 F.2d at 436-37.

16

his authority"[11] (emphasis added).  Obviously, article 781 of the Code Napoleon, unlike article 84 of the Digest of 1808 or its successors, expressly allows the heirs of an heir to either accept or renounce a succession on behalf of the dead heir, and thus would allow the transaction attempted in this case.  The question remains what significance we should attach to this fact.

Under Louisiana law, it is well established that the French version of the Code of 1825 is controlling as to articles with a civilian heritage that have not been changed since that time. Pickett v. RTS Helicopter, 128 F.3d 925, 931 (5th Cir. 1997) (citing Shelp, 333 F.2d at 438-39).  As we have seen, article 1007 of the current Louisiana Civil Code is an exact copy of the English text of the civilian article 1001 of the Code of 1825, so the Shelp rule applies in the resolution of this case.

As Judge Wisdom's excellent discussion of Louisiana civil code interpretation in Shelp teaches, however, the relevance of old and somewhat hoary French law must go even farther in some instances. "'The very nature of a code requires that . . . when an article abstracts the preexisting law the earlier jurisprudence be considered in cases not covered by the abstract.'"  Shelp, 333 F.2d

---

[11]"*Lorsque celui à qui une succession est échue, est décédé sans l'avoir répudiée ou sans l'avoir acceptée expressément ou tacitement, ses héritiers peuvent l'accepter ou la répudier de son chef.*"

17

at 435 (quoting Dreyfous, <u>Partial Defacement of Olographic Wills</u>, 15 Tul. L. Rev. 272, 273-74 (1941)).  As the Louisiana Supreme Court stated in deciding how to construe another article from the Code of 1825 that had been taken, like article 1007, directly from the Digest of 1808:

> The re-printing of [the Digest of 1808], together with the [1824] amendments, [in 1825] has induced some persons to believe that the whole code is to be taken as a new enactment, but this is not correct. . . . The article, therefore, now under consideration, must be governed by the rules which we have frequently applied to laws passed antecedent to the constitution [of 1812].

<u>Durnford v. Clark's Estate</u>, 3 La. 199, 202 (1931); <u>see also</u> <u>Flower v. Griffith</u>, 6 Mart. (n.s.) 89 (La. 1827) (holding that the omission in the Code of 1825 of certain articles from the Digest of 1808 did not constitute a repeal of those earlier articles).[12]

In this case, our investigation of article 1007's statutory predecessors leads us to the conclusion that when article 781 of the Code Napoleon was taken into the Digest of 1808 and thence into the Code of 1825, it was simply rephrased and abstracted, resulting

---

[12]As is evident from <u>Durnford</u>, this relevance of pre-1825 law remains despite the fact that the Louisiana legislature attempted to repeal the earlier law on multiple occasions in 1825 and 1828. <u>See</u> <u>Shelp</u>, 333 F.2d at 435-36, 437; <u>see also</u> <u>Moulin v. Monteleone</u>, 165 La. 169, 178-84 (1927) (holding that provisions of the Code of 1825 are still properly interpreted according to the legal principles that prevailed in Louisiana preceding the Code's adoption), <u>overruled as to result by</u> <u>9 to 5 Fashions, Inc. v. Spurney</u>, 538 So.2d 228, 234 (La. 1989) (Dennis, J.).

in the current wording. This reworking resulted in a considerably more streamlined sentence, but, out of inadvertence or a misguided desire to avoid unnecessary verbiage at all costs, omitted the final instance of "repudiate." This is the only explanation that makes any sense in the light of the fact that we can ascertain no indication that the change in wording was intended, desired, or even authorized to materially alter the effect of article 781 of the Code Napoleon. See Shelp, 333 F.2d at 433 n.4 (noting that the Digest of 1808 was entitled "A Digest of the Civil Laws *Now in Force* in the Territory of Orleans with Additions and Amendments Adapted to its Present System of Government" (emphasis added)).[13] For this reason,[14] we conclude that the entire substance of article 781 of the Code Napoleon was transmitted into the Code of 1825, including the final instance of "repudiate." The gist of this conclusion is that the current article 1007 must be read to allow

---

[13]Although the laws "in force" at the time were technically those of Spain, not France, because France and Spain are both civil law countries, and because the chief source of the Code of 1825 was the Code Napoleon, "[t]he codes of Louisiana can be [best] explained by assuming that the redactors concluded that in most respects the law of Louisiana was the same as the law of France." Dreyfous, 15 Tul. L. Rev. at 274.

[14]Our result is also bolstered by the fact that the one minor difference in wording between the French text of article 1001 of the Code of 1825 and that of article 84 of the Digest of 1808 suggests an express allowance for partial acceptances in the Digest version. See note 9, supra ("*le parti de l'acceptation ou de la répudiation*").

19

the heirs of an heir to either accept *or renounce* a succession on behalf of the dead heir so long as the other requirements are met.

This historical reading of article 1007 accords with the understanding of the principal commentators to have considered the question.  In 1997, Louisiana completed a comprehensive revision of the law of successions and donations[15] that found its inspiration in a proposal from the Louisiana Law Institute.  Article 955 of the proposal, which was destined to replace article 1007,[16] provided: "If a successor dies without having accepted or renounced succession rights, his right to accept *or renounce* is transmitted to his successors."  Kerry J. Miller, Comment, The New Forced Heirship Law, its Implementing Legislation, and Major Substantive Policy Changes of the Louisiana State Law Institute's Proposed Comprehensive Revision of the Successions and Donations Laws, 71 Tul. L. Rev. 223, 285 (1996) (emphasis added).  Under Miller's interpretation, "[p]roposed Article 955 reproduce[d] the substance of current Civil Code Article 1007 which allows the transmission of

---

[15]This case, obviously, is governed by the prior law.

[16]Article 955 did not make it into the final revision. Beginning in 1999, the Louisiana Civil Code will apparently no longer have any express provision concerning the renunciation *or* acceptance of succession rights by the heirs of an heir.  One might say that this development adds finality to a creeping 200 year process of eroding the clarity from article 781 of the Code Napoleon.

a successor's rights to his successors if he dies before accepting or renouncing." Id. at 254. Miller's conclusion is identical to that reached by two treatise writers in reviewing an earlier version of the same proposal. See 10 Frederick William Swaim, Jr. and Kathryn Venturatos Lorio, Louisiana Civil Law Treatise § 7.12 at 161 & n.20 (West 1995).

Finally, the historical reading also accords with common sense. Succession rights are inherently a binary phenomenon in the Louisiana statutory scheme; they must either be accepted (expressly, tacitly, or by presumption) or rejected (expressly only). See La. Civ. Code art. 977. Just as the repudiation of a succession will not be presumed, see La. Civ. Code art. 1017, so too can no one be compelled to accept, see La. Civ. Code art. 977. In this context, it would be well-nigh meaningless to give an heir a right to accept without an accompanying right to reject.

The only response that the Commissioner has offered to this analysis has been to suggest that, even if article 1007 is read to contain an implicit right to renounce, that right should be construed as a right to renounce the derivative succession coming from the dead heir, not a right to renounce the succession going to that heir on her behalf. The Commissioner bases this argument on the current text of article 1007, which contains the fairly

21

ambiguous language that "[the heir of an heir] shall have a right to accept [the succession] *under him*" (emphasis added).

Unfortunately for the Commissioner, his argument flies in the face of the clear French text of article 1001 of the Code of 1825, and is thus invalid under the core holding of Pickett and Shelp. As noted, the French text of article 1001 provides that, when an heir dies before accepting or rejecting a succession, "*ses héritiers peuvent l'accepter de son chef.*" Although this last passage was originally translated as "his heirs shall have a right to accept it *under him*," it should more appropriately be read as "his heirs may accept it *under his authority*."[17] As noted, the core holding of Pickett and Shelp makes this more correct translation controlling, so there is no merit to the Commissioner's alternate theory.

Based on the foregoing history, commentators, and logic, we hold that article 1007 does allow for the renunciation of a succession by the heirs of an heir on her behalf. Article 84 of the Digest of 1808 was clearly intended to reproduce all of the substance of article 781 of the Code Napoleon, and the omission of the final instance of "repudiate" was likely an inadvertent side

---

[17]In the juridical context, "*de son chef*" = "under his right." Harper-Collins-Robert French~English English~French Dictionary at 117 (2d ed. 1990).

effect of the streamlining of the sentence. Every commentator who has considered the issue has apparently assumed this to be the case, no doubt because it is the only interpretation that makes any sense in the light of the statutory framework.

Because Louisiana law does allow for the renunciation of a succession by the heirs of an heir on her behalf, the renunciation in this case was valid to pass an interest under state law. The district court's ruling that it was not was in error, and we reverse accordingly.

C

Even conceding this point, however, the Commissioner next argues that the renunciation in this case was nonetheless not a qualified disclaimer because Sammie Delaune had accepted the benefits of Jack's succession prior to her death. Based on the Service's own regulations and letter rulings, we find absolutely no merit to this argument.

As noted, § 2518(b)(3) requires that the disclaimant not have accepted the benefits of the interest in order for a disclaimer to be qualified for federal estate tax purposes. The Commissioner argues that Sammie Delaune accepted the benefits of Jack's succession by allowing her expenses to be paid out of a community property account and by allowing the interest on the succession to accumulate therein.

23

Under Treas. Reg. § 25.2518-2(d), "[a]cceptance [of benefits for purposes of § 2518(b)(3)] is manifested by an affirmative act which is consistent with ownership of the interest in property." See also Estate of Monroe, 124 F.3d at 705. Even if William Delaune's actions in this case may be somehow attributed to Sammie,[18] there seems little doubt that the instances cited by the Commissioner do not constitute "affirmative act[s] consistent with ownership." Simply put, it was not "consistent with ownership" of Jack's succession for Sammie to pay her own expenses from funds in a joint community property account to which she had an equal right,[19] nor was it "an affirmative act" for Sammie passively to "accept" routine interest accrual.

The Commissioner is not wholly unaware of the legally curious nature of his position in the light of his own regulation, and he attempted at oral argument to disavow its binding authority. As we recently held in Estate of McLendon v. Commissioner of Internal Revenue, 135 F.3d 1017, 1024 (5th Cir. 1998), however, "the

---

[18]An attribution we have some difficulty in swallowing, as William Delaune does not appear to have had any legal authority to act on Sammie's behalf.

[19]This is particularly so in the light of the fact that Sammie's expenses undisputedly never exceeded even her portion of the income from the community's property, and the fact that the Commissioner has been consistently deferential towards withdrawals from joint accounts in his own private letter rulings in this area. See, e.g., T.A.M. 86-19-002.

Commissioner will be held to his published rulings in areas where the law is unclear, and may not depart from them in individual cases." Although the issue in McLendon concerned a revenue ruling, its rule applies a fortiori in the case of a bona fide treasury regulation, and the Commissioner may not escape the effect of Treas. Reg. § 25.2518-2(d) on the admittedly murky question posed by this case. Indeed, we are a little perturbed that he would even try.

Because we find that the Commissioner's instances of purported acceptance do not meet the "affirmative ownership act" standard established in his own regulation, we conclude that Sammie had not accepted the benefits of Jack's succession prior to her death. In the light of our earlier finding that the February 27 renunciation was effective to pass an interest under Louisiana law, we therefore conclude that it was a qualified disclaimer for federal estate tax purposes, and that the declaration of deficiencies was in error.

D

Having held that the declaration of deficiencies was in error, it only remains to be decided how much the Delaunes may recover in this case. As noted, only the estate of Sammie Delaune and nine of her fourteen heirs have sued for a refund. They request, however, that the entire amount of the deficiency be remitted to their custody.

25

Under I.R.C. § 6402(a), a refund may only be obtained by the taxpayer who made the overpayment. As other circuits have construed this provision in the context of refund actions, it means that standing is limited to the party or parties who have at least arguably or derivatively made an actual overpayment, such that they have a financial interest in the litigation. See Atlas Hotels, Inc. v. United States, 1998 WL 154465, *2 (9th Cir. 1998); Estate of Fink v. United States, 852 F.2d 153, 155 (6th Cir. 1988) (both citing Bruce v. United States, 759 F.2d 755, 758-59 (9th Cir. 1985)); cf. First National Bank of Fort Worth v. United States, 633 F.2d 1168, 1171 (5th Cir. 1981) (quoting a district court predecessor to Bruce, Scanlon v. United States, 330 F. Supp. 269 (E.D. Mich. 1971), approvingly in a related context); Thomasville Automotive Parts, Inc. v. United States, 609 F.2d 1136, 1137 (5th Cir. 1980) (noting that § 6402(a) creates a right of recovery only in the case of an overpayment).

We agree with our sister circuits on this point, and further find that a necessary corollary to their rule is that any party's standing to seek a refund in a given case is limited to the amount of his own overpayment. Cf. United States v. Elam, 112 F.3d 1036, 1038 (9th Cir. 1997) ("Spouses who file a joint return have separate interests in any overpayment [recoverable under § 6402(a)], the interest of each depending upon his or her relative

26

contribution to the overpaid tax.")  In this case, it is undisputed that the parties before this court did not make payment on the entire deficiency.  Their recovery is therefore limited to the amounts that they paid, which we find to be $75,994 in total.

V

For the foregoing reasons, we REVERSE the judgment of the district court and RENDER for the Delaunes in the amount of $75,994.

REVERSED and RENDERED.