T.C. Memo. 2013-43

UNITED STATES TAX COURT

ESTATE OF VIRGINIA V. KITE, DONOR, DECEASED, BANK OF
OKLAHOMA, N.A., EXECUTOR/TRUSTEE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ESTATE OF VIRGINIA V. KITE, DECEASED, BANK OF OKLAHOMA, N.A.,
EXECUTOR/TRUSTEE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 6772-08, 6773-08.          Filed February 7, 2013.

<u>John N. Hermes</u>, <u>Dee A. Replogle, Jr.</u>, and <u>Spencer W. Haines</u>, for petitioner.

<u>Ann L. Darnold</u>, for respondent.

**[*2]**       MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  In these consolidated cases, respondent issued two notices of

deficiency, taking alternative positions with respect to a private annuity transaction.

In the notice of deficiency for docket No. 6772-08, respondent determined a

$6,053,752 deficiency in the 2001 Federal gift tax of Virginia Vose Kite (Mrs.

Kite).  In the notice of deficiency for docket No. 6773-08, respondent determined a

$5,100,493 deficiency in the Federal estate tax of the Estate of Virginia V. Kite

(estate).[1]

Mrs. Kite was the current income beneficiary of numerous trusts, only four of

which are at issue in these cases.  The four trusts, which are described in more detail

below, include:  two qualified terminable interest property (QTIP) trusts, one marital

deduction trust, and one revocable trust.  In 2001 the QTIP trusts and the marital

deduction trust were liquidated, and the trusts' assets, which consisted entirely of

family partnership interests, were transferred to Mrs. Kite's lifetime revocable trust.

The family partnership interests held by the lifetime revocable trust were then

transferred to Mrs. Kite's children in exchange for 10-year deferred private annuity

agreements.

---

[1]The estate concedes the adjustment that the taxable estate includes $20,750 of gift tax Mrs. Kite paid within three years of her death.

**[*3]**   The Court must now decide:  (1)  whether the transfer of partnership interests to Mrs. Kite's children in exchange for the private annuity agreements was a disguised gift subject to gift tax; (2) whether the transfer of the QTIP trust assets constituted a disposition of the qualifying income interest for life such that the disposition was a taxable gift of the remainder interest under section 2519;[2] and (3) whether Mrs. Kite made a taxable transfer under section 2514 when she effectively released her general power of appointment over the corpus of her marital deduction trust.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  The stipulation of facts and the attached exhibits are incorporated herein by this reference.  Mrs. Kite resided in Oklahoma when she died on April 28, 2004.  Bank of Oklahoma, N.A. (BOK), the executor of the estate, filed the petition on behalf of the estate.

I.  Mrs. Kite's Background

Mrs. Kite was born on April 8, 1926.  Her father was the chairman of a family-owned bank, Vose Bank, and its successor, First National Bank & Trust

---

[2]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.

[*4] Co. of Oklahoma City (FNB).[3] As a member of a prominent banking family, Mrs. Kite was the beneficiary of numerous trusts,[4] which held, among other valuable assets and cash, a portfolio of founder's shares and other securities of FNB, its affiliates, and its regional partners.

Business acumen was also passed on from generation to generation. Mrs. Kite was a savvy businesswoman who actively participated in managing her assets. She maintained an office where two employees assisted with her family's finances. In addition, she would meet with her trust administrator at least quarterly to discuss the financial activities of her many trusts and their investments.

Mrs. Kite married James B. Kite (Mr. Kite), who, according to his death certificate, was a geologist in the petroleum business. They were married until Mr. Kite's death on February 23, 1995. The couple had three children: Carolyn K. Eason (Ms. Eason), James B. Kite, Jr. (Mr. Kite, Jr.), and Virginia K. Kite (collectively, Kite children). After Mr. Kite's death, Mrs. Kite remained a widow until she died.

---

[3]Through a merger and acquisition, FNB eventually became a part of Bank of Oklahoma, N.A. (BOK).

[4]At trial, a representative of BOK's trust department testified that there were 70 trusts for the benefit of Mrs. Kite or her children.

[*5] II.  The Trusts

Before describing the transactions in dispute, the Court will introduce the types of trusts involved, which, except for the two QTIP trusts, are each governed by different provisions of the Code.

A.  Kite Family QTIP Trust (QTIP trust-1)

On February 15, 1995, Mrs. Kite created the Kite Family QTIP Trust as an irrevocable trust for the benefit of Mr. Kite, the sole income beneficiary during his life.  Upon his death, however, Mrs. Kite was to be named the sole income beneficiary during her life, and after her death, the corpus of the trust was to be distributed into three separate trusts of equal value:  one for each of the Kite children.  Boatmen's Trust Co., which has been succeeded by BOK, was the original trustee.

Mrs. Kite funded the trust for the benefit of Mr. Kite with her separate property by contributing 120,670 shares of common stock of Oklahoma Gas & Electric Co. (OG&E), with an adjusted basis of 34 cents per share.  On the date of the gift, the shares had a value of $4,246,075.60, which Mrs. Kite reported on her 1995 Federal gift tax return[5] as a gift.  Mrs. Kite, however, deducted the value of

_____

[5]Before her gift to Mr. Kite in 1995, Mrs. Kite filed several other gift tax returns for gifts made in 1976, 1986, and 1987 of $30,000, $77,000, and

(continued...)

**[*6]** the gift as a marital deduction under section 2523 and therefore did not owe any Federal gift tax on the transfer.

Under the Kite Family QTIP Trust agreement, the trustee was required to pay to Mr. Kite,[6] or otherwise use for his benefit, all income from the trust during his life. In addition, if the trustee determined that the income from the trust was insufficient for Mr. Kite's maintenance, support, and education, then the trustee could distribute the amount of principal necessary to provide for his maintenance. The trustee was also authorized to terminate the trust at any time when, in the judgment of the trustee, the trust corpus was too small to justify management as a trust, or the trust otherwise should be terminated. The trustee's powers, however, were limited. The trustee could not prevent all or any part of the trust from qualifying for the Federal gift tax marital deduction if elected by Mrs. Kite under section 2523(f), or the Federal estate tax marital deduction if elected under section 2056(b) by Mr. Kite's personal representatives.

---

[5](...continued)
$551,802.40, respectively. Mrs. Kite reported zero gift tax due each year. In 1987 Mrs. Kite transferred 18,820 shares of OG&E common stock, with a zero adjusted basis, to her grandchildren. In 1976 and 1986 Mrs. Kite transferred cash to Mr. Kite and her children.

[6]Mr. Kite was the first current income beneficiary, and after he died Mrs. Kite was named the current income beneficiary. The terms of the trust agreement otherwise remained the same.

**[*7]**   Mr. Kite died on February 23, 1995, only one week after Mrs. Kite created

the Kite Family QTIP Trust.  The executor of Mr. Kite's estate made a section

2056(b)(7) election on the estate's return for the Kite Family QTIP Trust, thereby

qualifying the trust property passing to Mrs. Kite for the marital deduction.  The

Court will refer to the Kite Family QTIP Trust as QTIP trust-1.

B.  Virginia V. Kite GST Exemption QTIP Trust (QTIP trust-2)

Upon Mr. Kite's death, his estate was transferred to his lifetime revocable

trust (which became irrevocable upon his death) except for certain tangible

personal property that was transferred to Mrs. Kite directly.  Pursuant to the terms

of his lifetime revocable trust, the amount of Mr. Kite's marital estate[7] equal to the

maximum generation skipping transfer (GST) exemption available to his estate

funded the Virginia V. Kite GST Exemption QTIP Trust.  On Mr. Kite's estate tax

return, the executor made a section 2056(b)(7) election for the Virginia V. Kite

GST Exemption QTIP Trust, which, like the election for QTIP trust-1, qualified

the trust property passing to Mrs. Kite for the marital deduction.  The Court will

---

[7]Mr. Kite's lifetime revocable trust defined "marital estate" as the maximum potential marital bequest reduced by an amount that could pass free of estate tax by reason of Mr. Kite's remaining unified credit and any other available credit.  The remainder of his trust estate was defined as the "residuary estate."

**[*8]** refer to the Virginia V. Kite GST Exemption QTIP Trust as QTIP trust-2, and collectively with QTIP trust-1, as the QTIP trusts.

C. <u>Virginia V. Kite Marital Trust (marital deduction trust)</u>

After the funding of QTIP trust-2, the balance of Mr. Kite's marital estate[8] funded the Virginia V. Kite Marital Trust (a.k.a., the Virginia V. Kite Non Exempt Marital Trust). The property passing to Mrs. Kite through the Virginia V. Kite Marital Trust also qualified for the marital deduction, but was excluded from the section 2056(b)(7) QTIP election. Instead, it qualified for the marital deduction under section 2056(b)(5).[9] The Court will refer to the Virginia V. Kite Marital Trust as the marital deduction trust.

D. <u>Virginia V. Kite GST Exemption Residuary Trust (residuary trust)</u>

The remainder of Mr. Kite's trust estate was distributed to the Virginia V. Kite GST Exemption Residuary Trust for the benefit of Mrs. Kite during her life and, after her death, to equal trusts for each of the Kite children. The value of the

---

[8]<u>See</u> <u>supra</u> note 7.

[9]The executor of Mr. Kite's estate reported a gross estate of $15,480,131, a marital deduction of $15,279,725, and zero Federal estate tax. The marital deduction included the following trust allocations: (a) $4,291,327 to QTIP trust-1, (b) $825,213 to QTIP trust-2, and (c) $10,143,808 to the marital deduction trust (collectively, the marital trusts). All of the underlying trust assets, including the OG&E stock transferred to Mr. Kite in 1995, received a step-up in basis under sec. 1014.

**[*9]** residuary trust property was reported on Mr. Kite's estate's Federal estate tax return as $200,406, but it was not included in the marital deduction claimed by Mr. Kite's estate.[10]  The Court will refer to Virginia V. Kite GST Exemption Residuary Trust as the residuary trust.

E.  Virginia V. Kite Revocable Trust (lifetime revocable trust)

Like her husband, Mrs. Kite created a lifetime revocable trust that, upon her death, directed the allocation of Mrs. Kite's trust estate among a GST Exemption Residuary Share and a Non-Exempt Residuary Share.  Each of these shares was to be immediately divided by the trustees into three parts of equal value for the benefit of Mrs. Kite's children.  The Court will refer to the Virginia V. Kite Revocable Trust as Mrs. Kite's lifetime revocable trust.

III.  Kite Family Tax Planning

A.  Brentwood Limited Partnership

On December 31, 1996, Mrs. Kite's trusts, which included the QTIP trusts, the marital deduction trust, the residuary trust, and her lifetime revocable trust, formed Brentwood Limited Partnership, an Oklahoma limited partnership, in exchange for limited partnership interests.  Brentwood's general partner was

---

[10]After Mrs. Kite's death, her estate's Federal estate tax return reflected three equal children's trusts titled "GST Exempt Residuary Trust" with assets of $345,598 per trust.

[*10] Easterly Corp. (Easterly Oklahoma), an Oklahoma corporation organized in December 1996 and wholly owned by Mrs. Kite and the Kite children, either individually or through trusts.[11]

In January 1997 Mrs. Kite, as trustee of her trusts, transferred to her children approximately one-third of her Brentwood limited partnership interests, with a value of $4.5 million.[12]  She also transferred to her children a portion of her Easterly Oklahoma shares with a value of $30,600.[13]  On a Federal gift tax return for 1997 Mrs. Kite reported the transfers as gifts and a Federal gift tax liability of $1,485,132.

---

[11]Mrs. Kite, through her lifetime revocable trust, owned a majority share of Brentwood's general partner, Easterly Oklahoma.  In addition to being the general partner, Easterly Oklahoma owned approximately 1% of Brentwood.

[12]The parties stipulated that the value of the Brentwood limited partnership interests transferred to Mrs. Kite's children was $4.5 million.  Mrs. Kite's 1997 Federal gift tax return reported that the partnership interests had a fair market value of $2,954,067 on the date of transfer, after applying a 34.354% lack of marketability and minority interest discount, and a combined adjusted basis of $4,054,701, which reflects the step-up in basis from transferring the OG&E stock through Mr. Kite's estate two years earlier in 1995.  Mrs. Kite also transferred to her grandchildren Brentwood limited partnership interests with an adjusted basis of $68,630 and a fair market value of $50,000.

[13]The shares of Easterly Oklahoma, which had an adjusted basis of $30,600, had a fair market value of $20,088 after applying a 34.354% discount.

**[*11]** B.  <u>Baldwin Limited Partnership</u>

In February 1998 Brentwood and Easterly Oklahoma reorganized in Texas seeking a more advantageous State tax jurisdiction.  To reorganize in Texas Brentwood merged into Baldwin Limited Partnership (Baldwin), a Texas limited partnership, and Easterly Oklahoma merged into Easterly Corp. (Easterly Texas), a Texas corporation, respectively.  The ownership interests remained the same.

In May 1998 Mrs. Kite, through her trusts,[14] sold her remaining interest in Baldwin to the Kite children, either individually or to their trusts, for $12,533,129.24 of secured, fully recourse promissory notes (Baldwin notes).  Under the terms of the Baldwin notes the Kite children, or their trusts, agreed to make quarterly payments of principal and interest, which accrued at a rate of 5.81% per annum, from August 1, 1998, through May 1, 2013.  The principal and interest payments totaled approximately $1,063,784 each year.  Mrs. Kite, as the current income beneficiary of her trusts, received the payments on the Baldwin notes.

---

[14]According to the record, the residuary trust, formerly a limited partner of Brentwood, did not participate in Mrs. Kite's sale of her remaining interest in Baldwin.  It is unclear whether the residuary trust received an interest in Baldwin after the merger.

[*12] C.  Kite Family Investment Company

On December 31, 2000, Mrs. Kite's trusts contributed the Baldwin notes and Easterly Texas contributed 1% of the value thereof to form Kite Family Investment Co. (KIC), a Texas general partnership.  As a result Mrs. Kite's trusts collectively held a 99% interest in KIC and Easterly Texas held a 1% interest.[15]  Easterly Texas, which was controlled by Mrs. Kite as the majority shareholder, was the manager of KIC.  Mrs. Kite's children or their trusts continued to make all required payments of principal and interest on the Baldwin notes now held by KIC.[16]

IV.  The Private Annuity Agreements

In 2001 Mrs. Kite, as trustee of her revocable trust, sold her interest in KIC to her children or their trusts for three private annuity agreements, with the first payments due 10 years later, in 2011 (annuity transaction).  At a meeting held on January 18, 2001, the annuity transaction was first presented to the Kite children

---

[15]KIC issued general partnership interests as follows:  (1) Easterly Texas, 1%; (2) Mrs. Kite's lifetime revocable trust, 24.62%; (3) the marital deduction trust, 49.51%; (4) QTIP trust-1, 20.84%, and (5) QTIP trust-2, 4.03%.  The residuary trust, which held a limited partnership interest in Brentwood, did not participate in the formation of KIC.

[16]The Baldwin note payments made from January 1, 2001, through Mrs. Kite's death on April 28, 2004, totaled $3,457,295.32, which included interest of $2,081,505.16.

**[*13]** by Gary Fuller (family attorney), the attorney for the Kite family.[17]  BOK's

trust officer, Debra A. Cooper, was also at the meeting in her capacity as the

administrator of Mrs. Kite's trusts.  Mrs. Kite was not present.

At the meeting, the family attorney explained the details of the annuity

transaction, which he described as an "estate planning tool", and its potential risks

and benefits.  Under the terms of the annuity transaction, the Kite children would

begin payments to Mrs. Kite or her trust 10 years[18] after the effective date of the

annuity agreements.  If Mrs. Kite died within the 10-year deferral period, her

annuity interest would terminate and, as a result, her interest in KIC, and indirectly

her interest in the Baldwin notes, would be effectively removed from her gross

estate.  However, if Mrs. Kite survived the 10-year deferral period, her children

would be personally liable for the annuity payments due on each annual payment

date.  What is more, if Mrs. Kite survived for 13 years or longer, her children

---

[17]The family attorney structured the annuity transaction and attended the meeting as counsel to Mrs. Kite, individually and on behalf of her revocable trust, and as counsel to each of the Kite children.

[18]The family attorney explained that the Internal Revenue Service (IRS) had "publicly accepted" a 10-year deferred payment annuity agreement as a valid contract.  See Rev. Rul. 72-438, 1972-2 C.B. 38.  Rev. Rul. 72-438, Example (5), 1972-2 C.B. at 40, describes the valuation of a 10-year deferred payment single life annuity purchased by a man at age 55.

[*14] could be insolvent after the first three years of payments, in view of their then-current personal assets.[19]

Mrs. Kite agreed to the terms of the annuity transaction after informally consulting with her children, the family attorney, and Ms. Cooper. Ms. Cooper assured Mrs. Kite that she could continue to maintain her lifestyle without the income from KIC, which passed to Mrs. Kite through the QTIP trusts, the marital deduction trust, and her lifetime revocable trust, and consisted primarily of the Baldwin note payments.[20] Moreover, after executing the private annuity agreements, Mrs. Kite still had a net worth exceeding $3.5 million, which was held primarily by Mrs. Kite's lifetime revocable trust,[21] and she was the current income beneficiary of eight other trusts holding approximately $20.8 million of marketable securities.

---

[19]Needless to say, after finalization of the proposed annuity transaction, the net value of the Kite children's personal assets would increase substantially.

[20]According to Ms. Cooper, BOK concluded that Mrs. Kite could maintain her lifestyle using funds from other trust sources as Mrs. Kite was the income beneficiary of multiple trusts. Ms. Cooper did not provide any economic or business reason for BOK's approval of the transaction, or documentation approving the transaction.

[21]Unlike the QTIP trusts and the marital deduction trust, which held assets that consisted solely of KIC partnership interests, Mrs. Kite's lifetime revocable trust assets were diversified.

[*15] In addition to consulting her family and business advisers, Mrs. Kite, who was 74 years old at this time, contacted her physician. Her physician sent Mrs. Kite a letter attesting to her longevity and health. The letter, dated March 6, 2001, stated in pertinent part as follows:

> I examined Mrs. Kite and interviewed her recently in her home
> * * * I would anticipate that her longevity and health outlook is
> good for the next several years * * * I am of the opinion that
> Mrs. Kite is not terminally ill and that she does not have an
> incurable illness or other deteriorating physical condition that
> would cause her to die within one year and that there is at least a
> 50% probability that she will survive for 18 months or longer.

Mrs. Kite's physician did not testify at trial.[22]

On March 28, 2001, Mrs. Kite met with Ms. Cooper, Mr. Kite, Jr., and the family attorney to prepare for the annuity transaction. At this meeting Mrs. Kite executed three documents that replaced the current trustees of the QTIP trusts and the marital deduction trust with the Kite children retroactively effective as of January 1, 2001. The Kite children, in their capacity as trustees, contemporaneously executed subsequent documents to terminate the QTIP trusts and the marital deduction trust effective January 1, 2001.[23] The assets in the

---

[22]Despite other testimony that reflected potentially failing health, none suggested that Mrs. Kite was terminally ill.

[23]Mr. Kite's revocable trust and the marital trusts derived therefrom allowed

(continued...)

[*16] QTIP trusts and the marital deduction trust, which consisted solely of KIC general partnership interests, were transferred to Mrs. Kite's lifetime revocable trust. As a result, Mrs. Kite's lifetime revocable trust held a 99% interest in KIC.[24]

The next day, March 29, 2001, Baldwin, which was now wholly owned by the Kite children or their trusts, contributed $13,684,136.13 of assets to KIC, more than doubling KIC's previous capital and diversifying its holdings. In return, Baldwin received a 55.8215% general partnership interest in KIC. Mrs. Kite's lifetime revocable trust and Easterly Texas owned KIC's remaining interests, 43.7367% and less than 1%, respectively.[25] Easterly Texas and Baldwin executed an amended and restated general partnership agreement admitting Baldwin as a

---

[23](...continued)
the Kite children, as trustees, to terminate the trusts "when, in the judgment of the trustees, the trust estate is too small to justify management as a trust, or the trust otherwise should be terminated."

[24]Previously, the QTIP trusts, the marital deduction trust, and Mrs. Kite's lifetime revocable trust collectively held a 99% interest in KIC.

[25]The Court notes that the general partnership percentages of KIC provided by the parties do not equal 100%. According to KIC's amended and restated general partnership agreement, Easterly Texas owned 0.4417847%, Baldwin 55.8215272%, and Mrs. Kite's trusts 43.736681%, which total 99.9999929%. For purposes of the Court's opinion, however, the Court accepts the percentages stipulated by the parties. The Court further notes that after Baldwin's contribution to KIC, Mrs. Kite's interest in KIC, through her trusts, was diluted from 99% to 43.7367%. See supra note 15 and accompanying text.

[*17] general partner and reflecting their postcontribution ownership interests in KIC. Mrs. Kite, as trustee of her lifetime revocable trust, never signed the amended and restated general partnership agreement.

On March 30, 2001, Mrs. Kite's lifetime revocable trust sold its entire remaining interest in KIC to the Kite children for three unsecured annuity agreements.[26] Each of the Kite children promised to pay $1,900,679.34 to Mrs. Kite's lifetime revocable trust on March 30 of every year beginning in 2011 and ending on Mrs. Kite's death. On the same day, the Kite children, Easterly Texas, and Baldwin entered into an amended and restated general partnership agreement to record their ownership interests in KIC.

The Kite children did not make any annuity payments to Mrs. Kite before she died on April 28, 2004. On her 2001 through 2003 Federal income tax returns, Mrs. Kite reported income of $429,278, $654,962, and $302,176, respectively, and Federal income tax of $77,371 (as amended), $118,357, and

---

[26]The parties valued Mrs. Kite's remaining ownership interest of 43.7367% in KIC, held by her lifetime revocable trust, using its liquidation value of $10,605,278. The parties did not apply a discount. They valued the annuity agreements under the sec. 7520 regulations and actuarial tables. The parties calculated the annual annuity payment with reference to Rev. Rul. 72-438, Example (5), supra, and the rates prescribed by sec. 7520. The parties also used the IRS actuarial tables prescribed by Notice 89-24, 1989-1 C.B. 660, 662, to determine that Mrs. Kite's life expectancy exceeded the 10-year deferral period by 2.5 years.

[*18] $1,460, respectively. Mrs. Kite's reported medical expense deductions for 2001 through 2003 were $131,100, $142,136, and $176,982, respectively, of which $115,780, $114,587, and $170,845, respectively, were attributed to home health care. In addition to Mrs. Kite's reported income and trust assets, her lifetime revocable trust borrowed $779,984 from six family ancestor trusts in 2003. In 2004 her final income tax return through her date of death reported income of $10,227 and zero Federal income tax due.

V. Estate Tax Return of Mrs. Kite's Estate

Mrs. Kite died on April 28, 2004. The executor of Mrs. Kite's estate timely filed a Federal estate tax return on January 28, 2005, reporting a gross estate of $3,551,120 and a taxable estate of $2,281,517. The executor did not include Mrs. Kite's transferred interests in the Baldwin notes or KIC in the gross estate or adjusted taxable gifts. Respondent issued two notices of deficiency determining a $6,053,752 deficiency in Mrs. Kite's Federal gift tax for 2001 and a $5,100,493 deficiency in the estate's Federal estate tax. The estate's executor timely petitioned the Court.

**[*19]**                                    OPINION

I.  Burden of Proof

Generally, the Commissioner's determination of a deficiency is presumed correct, and the taxpayer bears the burden of proving it incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Under section 7491(a), the burden of proof may shift to the Commissioner if the taxpayer produces credible evidence with respect to any relevant factual issue and meets other requirements.  The estate has not argued or established that section 7491(a) applies, and therefore the burden of proof remains on the estate.

II.  The Private Annuity Transaction

A.  Federal Gift Tax, Generally

Section 2501(a) generally imposes a tax for each calendar year on the transfer of property by gift during the year.  Although the Code does not define what constitutes a gift for purposes of section 2501, transfers subject to the gift tax "are not confined to those only which, being without a valuable consideration, accord with the common law concept of gifts, but embrace as well sales, exchanges, and other dispositions of property for a consideration to the extent that the value of the property transferred by the donor exceeds the value in money or money's worth of the consideration given therefor."  Sec. 25.2512-8, Gift Tax

**[\*20]** Regs. Section 2512(b) further provides that "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift." Thus, the gift tax does not apply to a transfer for full and adequate consideration in money or money's worth. See sec. 25.2511-1(g)(1), Gift Tax Regs.

B. Positions of the Parties

The parties dispute whether the transfer of the KIC partnership interests to Mrs. Kite's children in exchange for the annuity agreements was made for adequate and full consideration.[27] Respondent argues that the transfer was a disguised gift subject to gift tax. Specifically, respondent argues that the annuity agreements did not constitute adequate consideration because they were structured to ensure that no annuity payment would be made and there was no real expectation of payment.

---

[27]The parties also dispute whether the annuity transaction was bona fide for purposes of sec. 2038. Sec. 2038 includes in a decedent's gross estate an inter vivos property transfer, other than a transfer by a bona fide sale for adequate and full consideration, within the three-year period ending on the date of the decedent's death. The annuity transaction, however, was executed more than three years before Mrs. Kite's death thereby making sec. 2038 inapplicable.

[*21] Relying on Estate of McLendon v. Commissioner, 135 F.3d 1017 (5th Cir. 1998), rev'g T.C. Memo. 1996-307, the estate argues that the annuity transaction was for adequate and full consideration because the parties used IRS actuarial tables to properly value the annuities. The estate further contends that the parties intended to comply with the terms of the annuity agreements, which were legally enforceable under State law, and that intent is supported by, inter alia, the Kite children's ability to make payments under the annuity agreements and Mrs. Kite's profit motive.

C. Adequate and Full Consideration

When determining whether adequate and full consideration has been exchanged, the Court generally considers whether the consideration received by the transferor is roughly equivalent to the value of the property given up. See Estate of Hurford v. Commissioner, T.C. Memo. 2008-278 ("'[U]nless a transfer that depletes the transferor's estate is joined with a transfer that augments the estate by a commensurate (monetary) amount, there is no "adequate and full consideration"'." (quoting Kimbell v. United States, 371 F.3d 257, 262 (5th Cir. 2004))). Here the transfer at issue is the March 30 exchange of Mrs. Kite's remaining interests in KIC, held by her lifetime revocable trust, for the annuity agreements. Thus, the question of whether the annuity transaction was for

[*22] adequate and full consideration turns on the proper valuation of Mrs. Kite's KIC interests and the annuities. See, e.g., Estate of McLendon v. Commissioner, 135 F.3d at 1021.

Section 7520 provides that the value of any annuity shall be determined under tables prescribed by the Secretary. Mrs. Kite and her children used IRS actuarial tables to value the annuities, and respondent does not argue that they used the tables improperly. Rather, respondent contends that they should not have used the actuarial tables to value a 10-year deferred annuity because Mrs. Kite's deteriorating health in 2001 made her death within 10 years foreseeable. In addition to the high probability of Mrs. Kite's death within 10 years, respondent argues that the lack of security for the annuity agreements, among other things, demonstrates that the parties had no real expectation of payment, and, consequently, the annuity transaction lacked substance. Respondent, as the party seeking to depart from the actuarial tables, bears the burden of proving that the circumstances justify the departure. See Estate of McLendon v. Commissioner, T.C. Memo. 1996-307 (citing Bank of Cal. v. United States, 672 F.2d 758, 759-760 (9th Cir. 1982)).

According to IRS actuarial tables in 2001, a 75-year-old woman without a terminal illness was expected to live 12.5 years, which was 2.5 years after the first

[*23] annuity payments were due. Section 1.7520-3(b)(3), Income Tax Regs., provides that the mortality component of the actuarial tables may not be used to determine the present value of an annuity if the individual who is the measuring life is terminally ill at the time of the transaction. A "terminal illness" is defined as an "incurable illness or other deteriorating physical condition" with at least a 50% chance of death within a year. Sec. 1.7520-3(b)(3), Income Tax Regs. In Estate of McLendon v. Commissioner, 135 F.3d 1017, a taxpayer who had terminal cancer, received 24-hour home health care, and, according to his physician, had a 10% chance of surviving for more than one year was not terminally ill for purposes of using IRS actuarial tables to value a private annuity transaction.

Before the annuity transaction, Mrs. Kite received a letter from her physician attesting to her health and longevity. He affirmed that Mrs. Kite did not have an incurable illness or other deteriorating physical condition that would cause her to die within one year. The physician further opined that Mrs. Kite had at least a 50% probability of surviving for 18 months or longer.

Respondent did not challenge the physician's letter or present evidence contradicting the physician. Instead, respondent relied on Mrs. Kite's 24-hour medical care at home, which began in 2001, and her increased medical costs from

[*24] 2001 through 2003 to conclude that her death within the next 10 years was foreseeable. Mrs. Kite's increased medical costs, however, were due primarily to the cost of home health care. Mrs. Kite's Federal income tax returns filed for 2001 through 2003 claimed medical expense deductions of $131,100, $142,136, and $176,982, respectively, of which $115,780, $114,587, and $170,845, respectively, were attributed to home health care. Although the increased medical costs[28] and home health care indicate that Mrs. Kite's health was in decline, they alone do not suggest, let alone prove, that Mrs. Kite had a terminal illness or an incurable disease. Rather, Mrs. Kite's increased medical costs merely demonstrate that Mrs. Kite was a wealthy, 75-year-old woman who, when faced with certain health problems, decided to employ health care aids at her home. Her decision to hire home health care was not unusual for a woman who was accustomed to hiring personal assistants. Moreover, as exemplified in Estate of McLendon, increased medical costs and home health care do not prove a terminal illness or other incurable disease for purposes of section 7520. Accordingly, Mrs. Kite was not precluded from relying on IRS actuarial tables to value the annuity transaction.

---

[28]Of interesting note, her prescription expense (typically not covered by insurance) was comparatively small, being only $830, $867, and $1,243, for 2001, 2002, and 2003, respectively.

**[\*25]** The annuity agreements therefore constituted adequate and full consideration and consequently were not subject to Federal gift tax.

Respondent's additional argument that the annuity transaction was illusory is also rejected. Generally, the Court considers separately whether a transfer was bona fide and whether it was supported by adequate and full consideration. Estate of Bongard v. Commissioner, 124 T.C. 95, 122-125 (2005). In Estate of Hurford v. Commissioner, T.C. Memo. 2008-278, for example, the Court held that the transfer of a surviving spouse's interests in a family limited partnership (FLP) to her children for private annuity agreements, while the surviving spouse was being treated for stage 3 liver cancer, was not bona fide. In reaching this holding, the Court relied upon the following: (1) the parties to the private annuity agreements intended to ignore the agreements they signed; and (2) the children, who did not have assets of their own to make the annuity payments, used the assets underlying the FLP interests to transfer income back to their mother beginning with the first month after the agreements were executed and each month thereafter. Id.

Unlike the private annuity agreements in Estate of Hurford, the annuity agreements between Mrs. Kite and her children were enforceable, and the parties demonstrated their intention to comply with the terms of the annuity agreements or, in the case of Mrs. Kite, to demand compliance. See, e.g., Estate of Strangi v.

[*26] Commissioner, 115 T.C. 478, 484-485 (2000) (holding that the Court generally accepts the validity of an agreement unless persuasive evidence shows that the agreement would not be enforced by the parties), aff'd in part, rev'd in part on other grounds, 293 F.3d 279 (5th Cir. 2002); see also Estate of Hall v. Commissioner, 92 T.C. 312, 335 (1989).  Before participating in the annuity transaction, Baldwin, which was wholly owned by the Kite children or their trusts, contributed approximately $13.6 million of assets to KIC.  As a result, the Kite children did not need to rely on the assets already held by KIC to make the annuity payments.  In addition, the Kite children did not transfer the assets underlying the KIC interests back to Mrs. Kite after the annuity transaction was completed.  In fact, they did not make any distributions from KIC, but allowed the KIC assets to accumulate in order to have income available when the annuity payments became due.[29]  The Kite children therefore expected to make payments under the annuity agreements and were prepared to do so.

Mrs. Kite also demonstrated an expectation that she would receive payments.  Mrs. Kite actively participated in her finances and over the course of her life demonstrated an immense business acumen.  Accordingly, it is unlikely that Mrs. Kite would have entered into the annuity agreements unless they were

[29]Through the date of the trial, the KIC assets had not been distributed.

**[*27]** enforceable and, more importantly, she could profit from them. In addition, Mrs. Kite, unlike the surviving spouse in Estate of Hurford, was not diagnosed with cancer or other terminal or incurable illness. In fact, the record, which includes a letter from Mrs. Kite's physician, establishes to the contrary--that Mrs. Kite was not terminally ill and she did not have an incurable illness or other deteriorating physical condition. Mrs. Kite and her children reasonably expected that she would live through the life expectancy determined by IRS actuarial tables, which was 12.5 years after the annuity transaction. Indeed, if Mrs. Kite lived to her life expectancy as determined by IRS actuarial tables, she would have received approximately $800,000 more in annuity payments than the value of her KIC interests. At a minimum, Mrs. Kite would have made a profit with the potential of a greater return if she lived longer.

Mrs. Kite's profit motive is further underscored by her access to other financial assets, making her interests in KIC dispensable and available for a potentially risky investment. After executing the annuity agreements, Mrs. Kite was still the current income beneficiary of eight trusts holding approximately $20.8 million of marketable securities and her net worth exceeded $3.5 million, which was held primarily by Mrs. Kite's lifetime revocable trust. Her lifetime

[*28] revocable trust also had a line of credit of up to $800,000[30] of which she borrowed $779,984 from six family ancestor trusts in 2003. Mrs. Kite therefore did not need her income interest that flowed from KIC interests to maintain her lifestyle and, instead, opted to risk those interests for the potential profit from the annuity transaction.

Accordingly, based on the unique circumstances of these cases and, in particular, Mrs. Kite's position of independent wealth and sophisticated business acumen, the Court finds that the annuity transaction was a bona fide sale for adequate and full consideration.

D. Economic Substance

Alternatively, respondent argues that the annuity transaction, and the events leading up to it, should be disregarded and, as a result, Mrs. Kite's $10,605,278 of KIC interests is includible in her gross estate under section 2033. For the reasons discussed above, the Court disagrees with respondent's position that the annuity transaction lacked economic substance. However, because the trustee of Mrs. Kite's lifetime revocable trust did not sign the KIC partnership agreement admitting Baldwin into KIC, the Court must consider to what extent Mrs. Kite

---

[30]Interestingly, Mrs. Kite's line of credit equals the profit should would have received from the annuity transaction if she had lived to her life expectancy, as determined by IRS actuarial tables.

[*29] maintained an indirect ownership interest in KIC after Baldwin's admission and, if so, the value thereof.  A retained interest in KIC would be includible in Mrs. Kite's estate under section 2036.

To determine the exact nature of Mrs. Kite's interest in KIC after Baldwin's admission, the Court must look to State law of the entity, and in these cases, Texas partnership law.  See Adams v. United States, 218 F.3d 383, 386 (5th Cir. 2000). Texas caselaw demonstrates that Texas courts generally rely on a partner's intent, whether direct or implied, as controlling when determining the legal consequences of certain transfers of partnership property.  See, e.g., Logan v. Logan, 156 S.W.2d 507, 511-512 (Tex. 1941); see also Keller v. United States, 697 F.3d 238 (5th Cir. 2012); Church v. United States, 85 A.F.T.R.2d (RIA) 2000-804 (W.D. Tex. 2000) (applying Texas law to hold that the decedent's intention to transfer property to a family limited partnership overcame the decedent's failure to organize the partnership's planned corporate general partner with the Texas secretary of state before the decedent's death), aff'd, 268 F.3d 1063 (5th Cir. 2001).

On March 29, 2001, Baldwin contributed $13,684,136.13 of additional assets to KIC, which, up until that time, primarily held the Baldwin notes that Mrs. Kite had contributed.  In return, Baldwin received a 55.8215% general partnership interest in KIC, thereby diluting Mrs. Kite's indirect interest in KIC from 99% to

[*30] 43.7367%. The trustee of Mrs. Kite's lifetime revocable trust did not sign KIC's amended and restated general partnership agreement admitting Baldwin as a general partner.

On March 30, 2001, only one day after Baldwin's admission, the trustee of Mrs. Kite's lifetime revocable trust executed the annuity agreements. In each of the annuity agreements, the trustee represented that the lifetime revocable trust owned only a 43.7367% interest in KIC. Moreover, Mrs. Kite had approximately three years after the annuity transaction to correct the discrepancy, if any, in the amount or value of her KIC interests transferred subject to the annuity agreement. Therefore, despite the flawed partnership agreement purporting to document Baldwin's admission as a general partner of KIC, Mrs. Kite's subsequent actions manifest the requisite intent affirming Baldwin's admission and, consequently, Mrs. Kite's diminished interest in KIC. Accordingly, Mrs. Kite did not maintain an indirect interest in KIC that would otherwise be included in the estate under section 2036.

III. The Marital Deduction

In the alternative, respondent argues that the annuity transaction constituted a disposition of the qualifying income interests for life, as described in section 2056(b)(7), which Mrs. Kite held in the corpuses of the QTIP trusts such that the

**[\*31]** dispositions constituted taxable gifts under section 2519. Respondent also argues that Mrs. Kite made a taxable transfer under section 2514 when she effectively released her general power of appointment over the corpus of the marital deduction trust.

A. The Marital Deduction

Section 2056(a) provides that an estate may deduct the value of any interest in property passing from the decedent to his or her surviving spouse (marital deduction) to the extent such interest is included in determining the value of the gross estate. The policy behind the marital deduction is that property passes untaxed from a predeceasing spouse to a surviving spouse but is then included in the estate of the surviving spouse. Estate of Letts v. Commissioner, 109 T.C. 290, 295 (1997), aff'd without published opinion, 212 F.3d 600 (11th Cir. 2000). Thus, as a general rule, the marital deduction does not eliminate the estate tax on marital assets, but merely permits a deferral of tax until the death of the surviving spouse.[31]

---

[31]There are exceptions to this general rule. For example, assets that pass through the marital deduction may later be expended by the surviving spouse before he or she dies. In this situation the estate tax on the expended marital assets would be eliminated.

**[*32]** A marital deduction is generally not allowed if the conveyance is terminable interest property under section 2056(b)(1). A terminable interest is an interest in property that passes from a predeceasing spouse to a surviving spouse that will end on the lapse of time, on the occurrence of an event or contingency, or on the failure of an event or contingency to occur. Id. Upon termination of the surviving spouse's interest, the remainder interest passes to beneficiaries (other than the surviving spouse or her estate) selected by the predeceasing spouse, id., and thereby avoids inclusion in the surviving spouse's estate. The general purpose of the terminable interest rule is to not allow a marital deduction for transfers from a predeceasing spouse to the surviving spouse that have been structured to avoid estate tax when the surviving spouse dies. Estate of Novotny v. Commissioner, 93 T.C. 12, 16 (1989).

Section 2056(b)(7) provides an exception to the terminable interest rule and allows a marital deduction for qualified terminable interest property, i.e., QTIP.[32] Under section 2056(b)(7), the first spouse to die may pass to the surviving spouse an income interest in property for the surviving spouse's lifetime, and after the

---

[32]Sec. 2056(b)(7) was added to the Code in the Economic Recovery Tax Act of 1981, Pub. L. No. 97-34, sec. 403, 95 Stat. at 301, to expand the availability of the marital deduction. See H.R. Rept. No. 97-201, at 158-161 (1981), 1981-2 C.B. 352, 377-378.

[*33] death of the surviving spouse, the property passes to beneficiaries designated by the first spouse to die. To qualify as QTIP: (1) the terminable interest property must pass from the first spouse to die, (2) the surviving spouse must have a qualifying income interest for life in the property, and (3) the executor of the estate of the first spouse to die must elect to designate the property as QTIP. Sec. 2056(b)(7)(B). The surviving spouse has a qualifying income interest for life if he or she is entitled to all income from the property, payable annually or more frequently, or has a usufruct interest for life in the property, and no person has the power to appoint any part of the property to any person other than the surviving spouse. Sec. 2056(b)(7)(B)(ii).

According to the House report explaining the expansion of the marital deduction and the QTIP provisions, QTIP will be subject to transfer taxes at the earlier of (1) the date on which the surviving spouse disposes (either by gift, sale, or otherwise) of all or part of the qualifying income interest, or (2) upon the surviving spouse's death. See H.R. Rept. No. 97-201, at 161 (1981), 1981-2 C.B. 352, 378. Therefore, after the death of the surviving spouse, the value of his or her gross estate includes the value of QTIP. Sec. 2044. Alternatively, if the surviving spouse disposes of all or part of a qualifying income interest for life,

**[\*34]** section 2519 treats the disposition as a transfer of all interest in QTIP other than the qualifying income interest.[33]

Although section 2519 does not define a "disposition", section 25.2519-1(f), Gift Tax Regs., provides that the sale of QTIP, followed by the payment to the surviving spouse of a portion of the proceeds equal to the value of the surviving spouse's income interest, is considered a disposition of the qualifying income interest. As an example, section 25.2519-1(g), Gift Tax Regs., describes the tax consequences of the sale of a surviving spouse's life estate to a decedent's children. In section 25.2519-1(g), Example (2), Gift Tax Regs., which uses the same facts as example (1),[34] a personal residence valued at $250,000 passes from

---

[33]Thus, under secs. 2044 and 2519, property subject to a sec. 2056(b)(7) election is treated as property passing to the surviving spouse, even though only a life interest passes to the surviving spouse, and then transferred either at the surviving spouse's death, sec. 2044, or during his or her life, sec. 2519. In other words, the QTIP rules treat QTIP as passing entirely from the first spouse to die to the surviving spouse, thereby obtaining the deferral benefit of the marital deduction and escaping inclusion in the gross estate of the first spouse to die. In exchange for the deferral benefit, QTIP is included in the transfer tax base of the surviving spouse. See Estate of Morgens v. Commissioner, 133 T.C. 402, 412 (2009), aff'd, 678 F.3d 769 (9th Cir. 2012).

[34]Sec. 25.2519-1(g), Example (1), Gift Tax Regs., describes the tax consequences of the transfer of a surviving spouse's life estate in a personal residence to the spouse's children. Under the will of the first spouse to die, a personal residence valued at $250,000 passes to the surviving spouse for life, and after the spouse's death, to the decedent's children. The decedent's executor made

(continued...)

[*35] the decedent to the surviving spouse for life, and after the spouse's death, to the decedent's children. The decedent's executor made a valid election to treat the property as QTIP. During 1995, when the fair market value of the property is $300,000 and the value of the surviving spouse's life interest is $100,000, the surviving spouse sells her interest in the property to the decedent's children for $100,000. The example concludes that under section 2519 the surviving spouse has made a gift of $200,000 (i.e., $300,000, the fair market value of the QTIP, less $100,000, the value of the qualifying income interest in the property). The surviving spouse does not make a gift of the income interest under section 2511 because the consideration received for the income interest is equal to the value of the income interest.

Not included as a disposition for purposes of section 2519 is the conversion of QTIP into other property in which the surviving spouse has a qualifying income

---

[34](...continued)
a valid election to treat the property as QTIP. During 1995, when the fair market value of the property is $300,000 and the value of the surviving spouse's life interest in the property is $100,000, the spouse makes a gift of the spouse's entire interest in the property to decedent's children. The example concludes that under sec. 2519, the spouse has made a gift of $200,000 (i.e., the fair market value of the QTIP of $300,000 less the fair market value of the surviving spouse's qualifying income interest in the property of $100,000). In addition, under sec. 2511, the spouse makes a gift of $100,000, which is the fair market value of the surviving spouse's income interest in the property.

**[\*36]** interest for life.  Sec. 25.2519-1(f), Gift Tax Regs.  Section 25.2519-1(f), Gift Tax Regs., provides that the sale and reinvestment of assets of a trust holding QTIP is not a disposition of the qualifying income interest, provided that the surviving spouse continues to have a qualifying income interest for life in the trust after the sale and reinvestment.

### B.  The QTIP Trusts

When Mr. Kite died, his estate made a section 2056(b)(7) election to treat the marital deduction property passing to the QTIP trusts as QTIP assets.  Mrs. Kite, as Mr. Kite's surviving spouse, received a lifetime income interest in the trust assets; and after her death the trust assets were to be distributed into three separate trusts of equal value for each of the Kite children.  Mr. Kite's estate claimed a marital deduction for the value of the trust assets as follows:  $4,291,327 for QTIP trust-1 (which included the original $4,246,075.60 marital gift from Mrs. Kite) and $825,213 for QTIP trust-2.  Accordingly, under the QTIP regime, the QTIP trust assets underlying the marital deduction were to be subject to either gift tax under section 2519 if Mrs. Kite disposed of the income interest during her lifetime or estate tax under section 2044 if Mrs. Kite retained the income interest until her death.

[*37] In 1996 Mrs. Kite, through her trusts, contributed her trust assets to Brentwood in exchange for Brentwood limited partnership interests. As a result, instead of holding the trust assets underlying Mr. Kite's marital deduction, the QTIP trusts held Brentwood limited partnership interests. As the lifetime income beneficiary of these trusts, Mrs. Kite continued to receive the income interest from the QTIP trust assets that now passed from Brentwood to Mrs. Kite's trusts. Thus, under section 25.2519-1(f), Gift Tax Regs., Mrs. Kite did not dispose of her qualifying income interest because she continued to have a qualifying income interest for life in the QTIP trusts after reinvestment of the trust assets.

In 1997 Mrs. Kite, through her trusts, transferred limited partnership interests in Brentwood to her children and filed a Federal gift tax return reporting the transfers.[35] Although it is not clear from Mrs. Kite's 1997 Federal gift tax return whether she viewed, in part, her transfers as taxable gifts under sections 2519 and 2511, her payment of gift tax preserved the integrity of the QTIP election for the QTIP trust assets underlying the Brentwood limited partnership

---

[35]The Court notes that Mrs. Kite was able to reduce the taxable value of the assets underlying the Brentwood limited partnership interests by applying a 34.354% lack of marketability and minority interest discount to the limited partnership interests themselves. According to her 1997 Federal gift tax return, the adjusted basis of Brentwood limited partnership interests transferred to her children and grandchildren were reduced from $4,054,701 and $68,630, respectively, to a fair market value of $2,954,067 and $50,000, respectively.

[*38] interests. The QTIP trust assets, which avoided tax when transferred to the QTIP trusts upon Mr. Kite's death and later reinvested in Brentwood, was now taxable when transferred by Mrs. Kite in its reinvested form, i.e., as Brentwood limited partnership interests, to her children.

In 1998 and in 2000 Mrs. Kite, through her trusts, made three more transfers of the QTIP trust assets; but because Mrs. Kite maintained a qualifying income interest in the converted property, the transfers were not taxable under section 2519. In January 1998 Brentwood reorganized as Baldwin by merging into Baldwin. The ownership interests in Baldwin, formerly Brentwood, remained the same, and, accordingly, Mrs. Kite continued to receive her qualifying income interest in the QTIP trust assets indirectly through Baldwin.

Later in May 1998 Mrs. Kite, through her trusts, sold her remaining interest in Baldwin to her children for the Baldwin notes. Again, Mrs. Kite converted the QTIP trust assets underlying the Baldwin limited partnership interests into reinvested property, in this case the Baldwin notes. Mrs. Kite, as the grantor and current income beneficiary of her trusts, was the recipient of any payments made on the Baldwin notes and therefore continued to have the right to all income from the QTIP trust assets, payable at least annually.

[*39]  In 2000 Mrs. Kite, through her trusts, contributed the Baldwin notes to KIC in exchange for KIC partnership interests.  Like Mrs. Kite's initial investment of the QTIP trust assets in Brentwood, the transfer of the Baldwin notes to KIC was not taxable under section 2519 because Mrs. Kite, through her trusts' interests in KIC, continued to have a right to all payments on the Baldwin notes.  Thus, from 1996 through 2000 Mrs. Kite's transfers and reinvestments of the QTIP trust assets satisfied the requirements of the QTIP rules because she either continued to have a qualifying income interest in the reinvested property or, upon the transfer of the reinvested property to her children, she reported and paid Federal gift tax.

The liquidation of the QTIP trusts and subsequent sale of Mrs. Kite's interests in KIC, however, disregarded the QTIP rules.  In 2001 Mrs. Kite appointed the Kite children as trustees of the marital trusts, and the Kite children, as trustees, contemporaneously terminated the marital trusts.[36]  The marital trust assets were transferred to Mrs. Kite's lifetime revocable trust.[37]  Two days later

---

[36]Respondent argues that the Kite children's termination of the marital trusts and subsequent transfer of trust assets to Mrs. Kite's lifetime revocable trust was a breach of a fiduciary duty.  However, without more information regarding the Kite children's decision to terminate the trusts, the Court is reluctant to question the Kite children's discretion, as trustees, to terminate the trusts pursuant to the terms of the trust agreements.

[37]Respondent does not raise the issue of whether the Kite children's

(continued...)

**[\*40]** Mrs. Kite's lifetime revocable trust sold its entire interest in KIC to the Kite children for three unsecured private annuity agreements with a value of $10,605,278. The first annuity payments were due 10 years later, in 2011, and would continue every year until Mrs. Kite's death.

Respondent asks the Court to view the termination of the marital trusts and the annuity transaction as an integrated transaction. Respondent argues that "[i]n substance * * * [Mrs. Kite] has disposed of her income interest in the Q-TIP trusts in exchange for the deferred annuity." Courts use substance over form and its related judicial doctrines to determine the true meaning of a transaction disguised by mere formalisms, which exist solely to alter tax liabilities. See United States v. B.F. Ball Constr. Co., 355 U.S. 587 (1958); Commissioner v. Court Holding Co., 324 U.S. 331 (1945) . In such instances the substance of a transaction, rather than its form, will be given effect.

---

[37](...continued)
termination of the QTIP trusts, and the subsequent liquidation of QTIP trust assets, was a gift from the remainder beneficiaries, i.e., the Kite children, to the lifetime income beneficiary, i.e., Mrs. Kite. Discussion of such a liquidation can be found in Priv. Ltr. Rul. 9908033 (Feb. 26, 1999). Because the Court finds below that the termination of the marital trusts immediately followed by the sale of the marital trust assets is a single transaction for purposes of sec. 2519, the Court does not address the possibility of a gift of the remaindermen interest in the QTIP trusts. See also Rev. Rul. 98-8, 1998-1 C.B. 541 (regarding the gift tax consequences of the disposition of a qualifying income interest).

**[*41]** According to the record, which included testimony regarding the family attorney's presentation of the annuity transaction to the Kite children and subsequent negotiations of the annuity transaction with Mrs. Kite, the termination of the QTIP trusts was part of a prearranged and simultaneous transfer of the QTIP trust assets, i.e., Mrs. Kite's ownership interests in KIC. Although the QTIP trust agreements authorized the Kite children, as trustees, to terminate the QTIP trusts in their discretion, the estate has presented no explanation of why the QTIP trusts were terminated immediately before the transfer of the QTIP trust assets. Instead, by creating an intermediary step in the annuity transaction, i.e., terminating the QTIP trusts before selling the QTIP trust assets to the Kite children, Mrs. Kite's transfer of her ownership interests in KIC would circumvent the QTIP regime and avoid any transfer tax imposed by section 2519. Accordingly, the Court finds that the termination of the QTIP trusts and the following immediate transfer of the QTIP trust assets to the Kite children are treated as a single transaction for purposes of section 2519.

As discussed above, the sale of QTIP assets, followed by the payment to the surviving spouse of a portion of the proceeds equal to the value of the surviving spouse's income interest, is considered a disposition of the qualifying income interest. See sec. 25.2519-1(f), Gift Tax Regs. The Court held in Part II, above,

**[\*42]** that Mrs. Kite received adequate and full consideration for her interest in KIC. Accordingly, Mrs. Kite made a disposition of her qualifying income interest, which can be traced from KIC to the QTIP trusts.[38]

A surviving spouse who makes a disposition of all or part of a qualifying income interest for life in any property for which a deduction was allowed under section 2056(b)(7) is treated as transferring all interests in property other than the qualifying income interest. See sec. 25.2519-1(a), Gift Tax Regs. The amount treated as a transfer under section 2519 is equal to the fair market value of the entire property subject to the qualifying income interest, determined on the date of the disposition, less the value of the qualifying income interest in the property on the date of the disposition. Sec. 25.2519-1(c)(1), Gift Tax Regs. The gift tax consequences of the disposition of the qualifying income interest are determined separately under section 2511. Id.

As a result, the sale of Mrs. Kite's interest in KIC that can be traced to the QTIP trusts was subject to Federal gift tax under section 2519 to the extent of the

---

[38]The QTIP trusts contributed the Baldwin notes to KIC in exchange for an interest in KIC. When the QTIP trusts were terminated, their interest in KIC was transferred to Mrs. Kite's lifetime revocable trust. Mrs. Kite's lifetime revocable trust then sold its interest in KIC for the annuities.

[*43] fair market value[39] of the entire property subject to Mrs. Kite's qualifying income interest, determined on the date of the annuity transaction, less the value of her qualifying income interest. However, because Mrs. Kite received adequate and full consideration for her income interest in KIC, she did not make a gift of her qualifying income interest under section 2511.[40]

C. The Marital Deduction Trust

As discussed above, section 2056(b)(1) generally prohibits a deduction for terminable interest property. Section 2056(b)(5)(B) provides another exception to the terminable interest rule where the surviving spouse receives an income interest for life and a general power of appointment. If the surviving spouse dies without exercising the power, he or she will be subject to the estate tax under section 2041(a). Alternatively, if the surviving spouse, during his or her life, releases this

---

[39]According to Mr. Kite's estate tax return the fair market value of the QTIP trusts on the date of his death in 1995 was $4,291,327 for QTIP trust-1 and $825,213 for QTIP trust-2. See supra note 9. In 1997 Mrs. Kite, as trustee of her trusts, transferred $4.5 million of the Brentwood limited partnership interests held by her trusts, which included the QTIP trusts, to her children and filed a gift tax return reporting the transfer. See supra note 12. After subsequent transfers and reinvestments of her trust assets, including the QTIP trusts, Mrs. Kite's lifetime revocable trust held a 43.7367% interest in KIC, which had a liquidation value of $10,605,278. See supra note 26.

[40]Like surviving spouse described in sec. 25.2519-1(g), Example (2), Gift Tax Regs., Mrs. Kite received consideration for her income interest in the annuity transaction.

**[*44]** power or exercises it in favor of someone else, he or she will be subject to gift tax under section 2514.

Section 2514(b) provides that an individual who exercises or releases a general power of appointment created after October 21, 1942, is deemed to have transferred the related property. A general power of appointment is a power which is exercisable in favor of the individual possessing the power, his estate, his creditors or the creditors of his estate. See sec. 2514(c). Under section 25.2514-1(b)(1), Gift Tax Regs., a surviving spouse who has the power to discharge and appoint successor trustees is considered as having a power of appointment. Accordingly, even though someone other than the surviving spouse may serve as trustee, the power to appoint corpus will be attributed to the surviving spouse. See First Nat'l Bank of Denver v. United States, 648 F.2d 1286, 1289 (10th Cir. 1981); see also Estate of Wilson v. Commissioner, T.C. Memo. 1992-479.

In 1995 Mr. Kite's estate funded the marital deduction trust with a portion of Mr. Kite's marital estate and claimed a $10,143,808 marital deduction under section 2056(b)(5) for the value of the trust property. In March 2001 Mrs. Kite, pursuant to her authority to discharge and appoint successor trustees, replaced the trustee of the marital deduction trust with her children. Contemporaneously, the

[*45] Kite children, as trustees, terminated the marital deduction trust and transferred its assets to Mrs. Kite's lifetime revocable trust.

A "transfer of property" is defined as "any transaction in which an interest in property is gratuitously passed or conferred upon another, regardless of the means or the devise employed". Sec. 25.2511-1(c), Gift Tax Regs. The transfer of the trust assets to Mrs. Kite's lifetime revocable trust was not a transfer of property for gift tax purposes because Mrs. Kite did not transfer an interest in the property to another. See, e.g., Estate of Robinson v. Commissioner, 101 T.C. 499, 508-509 (1993). Instead, Mrs. Kite maintained her interest in the property as the grantor and the sole income beneficiary of her lifetime revocable trust. Therefore, Mrs. Kite did not make a taxable transfer of the marital deduction trust assets under section 2514.

In conclusion, the Court holds that the portions of the annuity value originally traceable to the ownership interest of QTIP trust-1 and QTIP trust-2 in Kite Family Investment Co., a Texas general partnership,[41] less the value of Mrs. Kite's qualifying income interests in QTIP trust-1 and QTIP trust-2, are subject to Federal gift tax as of the simultaneous termination of the marital trusts and the transfer of the marital trust assets in 2001.

---

[41]See supra note 15.

**[\*46]** The Court has considered the parties' arguments and, to the extent not addressed herein, concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.